**Stefen RICE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 45A03–0812–CR–606.

Court of Appeals of Indiana.

Nov. 30, 2009.

Mark A. Bates, Lake County Public Defender, Crown Point, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Henry A. Flores, Jr., Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Stefen Rice appeals his conviction of reckless homicide, a Class C felony.[1] Rice raises four issues: (1) whether the trial court abused its discretion by instructing alternate jurors that they could participate in discussions; (2) whether the trial court abused its discretion by admitting two photographs from the autopsy; (3) whether the trial court abused its discretion by excluding a portion of the evidence technician's testimony; and (4) whether the evidence was sufficient to support Rice's conviction. We affirm.

### FACTS AND PROCEDURAL HISTORY

On the evening of December 29, 2006, four teenagers, S.B., D.B., A.J., and S.R., went to a club that has a separate section for people who are underage. Afterwards, they went to S.R.'s house. S.R. asked Rice, his brother, to find someone to give S.B. and D.B. a ride home. Rice went to Deion Campbell's house, and Campbell agreed to take all of them to McDonald's and take S.B. and D.B. home. Rice sat in the front passenger seat, and S.R. sat be-

[1]. Ind.Code § 35–42–1–5.

hind him. Next to S.R. was S.B., then D.B., then A.J.

Campbell drove to McDonald's, and they went through the drive through. Campbell handed the food to Rice, who in turn passed out the food to the people in the back seat. As he was handing out the food, Rice noticed a gun stuck in the seat between him and Campbell. Rice grabbed the gun, it discharged, and the bullet struck S.B.

Campbell drove S.B. to the hospital, where it was discovered that the bullet had perforated S.B.'s pulmonary artery. S.B.'s chest was opened surgically so the physician could massage her heart and a major blood vessel was clamped off to stop the bleeding; however, the attempt to revive her was unsuccessful.

Campbell told Rice he would not "be the one to tell on" him, and Rice told him to say that somebody tried to rob them. (Tr. at 56.) Someone told D.B. to say she had been sleeping. The witnesses all initially told police S.B. had been shot by a robber or that they had been asleep and did not see what happened. A.J. hid the gun in an alley near the hospital, and it was never located.

Rice later admitted to police that he had been the shooter, and the other witnesses then admitted what they had seen. Rice was waived out of juvenile court and charged with reckless homicide.

At trial, Campbell testified that when the gun fired, he asked Rice what he was doing, and Rice was "just in shock." (*Id.* at 54.) Rice started crying and kept saying he "didn't mean to." (*Id.* at 56.) Campbell did not see the position of the gun when it was fired, but he did not "have any reason to think that this was anything other than an accident." (*Id.* at 83.)

D.B. testified that while they were waiting for their food, she saw Rice point an object into the back seat:

Q. Did you see Stefen point an object in the back seat that caused you to move?

A. Yes.

Q. What did you believe that object was?

A. Really I didn't know that it was a gun until it went off.

Q. But he pointed it at your direction and you had to, you got out of the way?

A. Yes....

Q. ... After you did that, how long was it before the gun went off?

A. Seconds.

Q. How was Stefen situated when he pointed this at you?

A. He just turned around basically and just pointed it.

(*Id.* at 93.) She later clarified that Rice did not appear to be aiming the gun. After the gun went off, Rice said he was sorry and "he didn't know it was [sic] bullets in the gun." (*Id.* at 94.) D.B. thought the shooting was an accident.

Alan Magurany, an evidence technician, examined the car. He found a bullet hole in the upper left side (i.e., toward the driver's side) of the seat where Rice was sitting. He testified the bullet traveled upward at about a forty-five degree angle into the head rest, where it hit a piece of metal. The bullet ricocheted off the metal part and started on a downward course before hitting S.B. and passing through the trunk.

Dr. John Cavanaugh, who conducted the autopsy, testified the bullet entered through S.B.'s sternum. It followed a path that went from front to back, slightly downward, and slightly to the left. The bullet exited near S.B.'s left shoulder

blade. During his testimony, photographs of the entry and exit wounds were admitted over Rice's objection.

Rice testified he picked up the gun to move it away from himself, and the gun went off even though he did not touch the trigger. He was not aiming it in any direction. He denied being the first to make up the story about the robber, but he admitted he was "in on it." (*Id.* at 245.)

The jury found Rice guilty as charged. On November 13, 2008, the trial court sentenced Rice to four years in the Department of Correction.

## DISCUSSION AND DECISION

1. *Alternate Jurors*

▇ Preliminary instruction 6 provided in part:

> You are permitted to discuss the evidence and testimony of the witnesses among yourselves in the jury room during recesses from the trial. But only when all of you are present. You should not form or express any conclusion or judgment about the outcome or verdict in the case until the court submits the case to you for deliberations.

(Appellant's App. at 74.) This instruction was based on Ind. Jury Rule 20(a), which requires trial courts to include certain information in the preliminary instructions, including "that jurors, including alternates, are permitted to discuss the evidence among themselves in the jury room during recesses from trial when all are present, as long as they reserve judgment about the outcome of the case until deliberations commence." Jury R. 20(a)(8).

Rice argues alternate jurors should not be allowed to participate in discussions, because discussions are the functional equivalent of deliberations. *See Ives v. State,* 275 Ind. 535, 418 N.E.2d 220, 225 (1981) (holding alternates may retire with jury, but are not permitted to participate in deliberations). Furthermore, he argues, if discussions are *de facto* deliberations, allowing alternates to participate in discussions impermissibly increases the size of the jury.

The Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution establish the right to a trial by jury, but neither provision mentions a specific number of jurors. *See Taylor v. State,* 687 N.E.2d 606, 609 (Ind.Ct.App.1997) ("The current view is that nothing in the federal or Indiana constitutions explicitly guarantees a specific number of jurors ...."), *trans. denied.* However, a defendant charged with murder or a Class A, B, or C felony has "a statutory right to a trial by a jury of twelve persons." *Id.* (citing Ind.Code § 35–37–1–1(b)(1)).

Recently, in *Weatherspoon v. State,* 912 N.E.2d 437, 441 (Ind.Ct.App.2009), we held permitting alternates to participate in discussions is not contrary to Ind.Code § 35–37–1–1(b)(1) or decisions prohibiting alternates from participating in deliberations. Our analysis began with the history of Jury R. 20:

> Jury Rule 20 went into effect on January 1, 2003. Subsection (a)(8), however, was not originally included in Jury Rule 20. A 2002 report based on Arizona Rule of Civil Procedure 39(f) concluded that allowing jurors to discuss evidence before deliberations had no substantial negative impact on the jury's ability to remain impartial and open-minded. Randall T. Shepard, *Jury Trials Aren't What They Used to Be,* 38 Ind. L.Rev. 859, 865 (2005). Initially, because of the Arizona report, Indiana amended Jury Rule 20 on September 30, 2004, to provide that "jurors [but not alternates] are permitted to discuss the evidence among themselves in the jury room when all

are present, as long as they reserve judgment about the outcome of the case until deliberations commence." Ind. Jury Rule 20(a)(8) (2005); Shepard, 38 Ind. L.Rev. at 865. Jury Rule 20(a)(8) went into effect on January 1, 2005. J.R. 20(a)(8) (2005); Shepard, 38 Ind. L.Rev. at 865. According to Chief Justice Shepard, Jury Rule 20(a)(8)

> is an important step in the process of reforming this state's jury system. Besides helping jurors to clarify confusing issues of evidence when they occur, and helping jurors to follow the dynamics of trial, allowing jurors to discuss evidence during the trial treats them as they are: intelligent, responsible adults. Because so much of the public's perception of jury service is built upon anecdotal evidence related by those who have served on juries, treating jurors as capable adults is important not only for promoting a better legal result, but in helping to eliminate the public's conception of jury service as tedious, belittling, and pointless.
>
> Allowing jurors to discuss the evidence before deliberations begin is an important step in reforming the Hoosier jury....

Shepard, 38 Ind. L.Rev. at 865.

Subsequently, Jury Rule 20(a)(8) was again amended on September 10, 2007, effective January 1, 2008, to provide that *alternates* are also permitted to discuss the evidence in the jury room during recesses from trial when all are present. *See* J.R. 20(a)(8) (2007) (pre-amended version not specifically mentioning alternates); J.R. 20(a)(8) (2008) (amended version specifically mentioning alternates).

*Id.* at 440.

We recognized that discussions bear some similarity to deliberations:

> During discussions, alternate jurors talk about issues of credibility, highlight and discount certain evidence, and narrow and broaden the issues, all of which may affect the final judgment or verdict, yet these discussions are the very discussions that alternate jurors may not have during deliberations.

*Id.* at 441. However, Jury Rule 20, which was adopted by our Supreme Court in the face of precedent prohibiting alternates from participating in deliberations, "unambiguously made a distinction between discussions and deliberations." *Id.* We agree with the *Weatherspoon* panel that we "are not at liberty to rewrite the rules promulgated by our Supreme Court," *id.*; therefore, we hold the trial court did not err in instructing the jury.

### 2. Autopsy Photographs

■■■ Rice argues the autopsy photographs should not have been admitted because there was no dispute as to the cause of S.B.'s death and the pathologist's testimony about the path of the bullet was not particularly complex. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the trial court's decision only for abuse of discretion. *Swingley v. State,* 739 N.E.2d 132, 133 (Ind.2000).

> Relevant evidence, including photographs, may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. "Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally." Photographs, even those gruesome in nature, are admissible if they act as interpretative aids for the jury and have strong probative value.

*Id.* (citations omitted).

Dr. Cavanaugh used the photographs to illustrate his testimony about the path of

the bullet. The trajectory of the bullet was a subject that was emphasized by both parties at trial. Therefore, although we agree Dr. Cavanaugh's testimony was not unusually technical, we cannot say the photographs could not have helped the jury understand the testimony and sort out the issues.

Nor were the photographs unnecessarily gruesome, such that their probative value is substantially outweighed by the danger of unfair prejudice. *See* Evid. R. 403. The photograph of the exit wound in S.B.'s shoulder does show some light streaks of blood. We cannot say this minimal amount of blood is prejudicial in light of the undisputed fact that S.B. was shot through an artery and lost a massive amount of blood. As to the photograph of the entry wound, the trial court granted Rice's request that S.B.'s breasts and a surgical opening be covered. The photo shows very little of S.B.'s body and is not bloody or gory. Therefore, we conclude the trial court did not abuse its discretion in admitting the photographs.

### 3. *Exclusion of Evidence Technician's Testimony*

■ On direct examination, Magurany explained that the bullet traveled upward at a forty-five degree angle through the front passenger seat and into the headrest, where it hit a piece of metal and ricocheted downward and toward the back seat. On cross-examination, defense counsel questioned Magurany as follows:

Q. But for the head rest, do I understand that the bullet would have continued out the roof of the car, but for that ricochet?

A. Hard to say but I don't think I can actually state that, but I mean, it is what it is. The bullet travels through the seat, the bullet does hit a piece of metal and it seems to

have altered its path and in a downward path.

Q. Am I correct that we can say from looking at the evidence that you uncovered, that that gun was pointed upward?

A. Again, I don't know what direction the gun was pointed at or fired but I mean, what I found is what I found. I really don't know how the gun was fired.

Q. Is that path that you observed in the seat consistent with the gun being pointed upward?

A. Yeah, possibly.

(Tr. at 182–83.)

At the end of Magurany's testimony, a juror asked, "Can you clarify the trajectory of the bullet?" (*Id.* at 188.) Magurany again explained that the bullet traveled upward, hit a piece of metal in the head rest, and then traveled on a downward path into the back seat and trunk. Defense counsel then asked some follow-up questions:

Q. ... When you say that it was facing the rear as opposed to straight up or forward ... it wasn't straight back like this, by any means, was it?

A. No, it was at about a 45 degree angle upward.

Q. And but for that head rest and the ricochet, it would not have hit anybody.

BY MR. CUROSH [prosecutor]:

I'm going to object, your Honor, that's speculative.

THE COURT:

Speculation. It's been asked and answered.

BY MR. PAGE [defense counsel]:

Q. Well, may I ask. The trajectory that you saw in that back seat if unimpeded would have taken that

bullet over the heads of anybody in the back seat, correct?

BY MR. CUROSH:

Objection again, that's speculation.

BY MR. PAGE:

I don't think that is, Judge.

THE COURT:

Depending on all tall the people were sitting in the, I mean there is a lot of variables in that, Mr. Page. Speculation.

BY MR. PAGE:

Q. Well, let me ask you this then. Unimpeded where on the roof of the car would the bullet have hit?

BY MR. CUROSH:

I'm going to object.

BY MR. PAGE:

No, your Honor, we don't have the car, only he saw the inside of the car.

THE COURT:

Okay, but speculation, the objection is sustained. We understand the bullet was at a 45 degree angle, upward from the front to the back.

(Tr. at 191–93) (errors in original).

Rice argues the trial court abused its discretion by not allowing him to ask Magurany where the bullet would have struck the roof of the car if it had been unimpeded by the headrest. Rice argues the exclusion of this testimony is prejudicial because it would show he did not aim the gun directly at the people in the back seat. Although the thrust of Rice's argument appears to be that the testimony would not be speculative, it is not clear Magurany knew the answer to the question. Even if he did, it was established that the bullet traveled upward at a forty-five degree angle before it ricocheted off of the metal in the headrest. Magurany testified the path of the bullet was consistent with the gun being pointed upward and slightly toward the back. Therefore, even if the trial court abused its discretion by disallowing the question, Rice was not prejudiced, because the testimony that was elicited allowed the jury to draw an inference that Rice was not aiming directly at the people in the back seat.

### 4. Sufficiency of the Evidence

In reviewing sufficiency of evidence, we do not reweigh evidence or assess the credibility of witnesses. *White v. State*, 846 N.E.2d 1026, 1030 (Ind.Ct.App. 2006), *trans. denied.* We consider only the evidence favorable to the verdict, along with the reasonable inferences to be drawn therefrom. *Id.* We will affirm if there is substantial evidence of probative value from which the jury could conclude the defendant was guilty beyond a reasonable doubt. *Id.*

"A person who recklessly kills another human being commits reckless homicide, a Class C felony." Ind.Code § 35–42–1–5. "A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." Ind.Code § 35–41–2–2(c).

Rice highlights his own testimony that the gun went off when he picked it up, but clearly the jury rejected his explanation. He also notes no one saw him pull the trigger, but he cites no authority for the proposition that the jury may not infer the trigger was pulled unless a witness saw it happen. D.B. saw the gun pointed in her direction at least briefly. The bullet holes in the seat indicate that when the gun was discharged it was pointed upward, but also somewhat toward the back. We cannot say that firing a gun in a car with six occupants is not reckless. *See Young v. State*, 699 N.E.2d 252, 257 (Ind.1998)

(reckless homicide instruction should have been given where Young fired toward a group of people twenty feet away, but did not appear to be aiming at any particular person). Therefore, we affirm Rice's conviction.

Affirmed.

CRONE, J., and BROWN, J., concur.